**UNITED STATES of America**

v.

**Clarence WHITFIELD, Appellant.**

**UNITED STATES of America**

v.

**Norman B. MONROE, Appellant.**

**Nos. 79–2305, 79–2337.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 9, 1980.

Decided July 11, 1980.

Rehearing Denied Aug. 7, 1980.

David A. Levitt, Washington, D. C. (appointed by this court), for Clarence Whitfield.

George W. Mitchell, Washington, D. C., for Norman B. Monroe.

Harold Damelin, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry and Paul N. Murphy, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee. Barbara E. Liles and Barry M. Tapp, Asst. U. S. Attys., Washington, D. C., also entered appearances for appellee.

Before TAMM and ROBB, Circuit Judges, and GERHARD A. GESELL,* United States District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge TAMM.

Opinion dissenting in part filed by District Judge GESELL.

TAMM, Circuit Judge:

After jury trial in the United States District Court for the District of Columbia,

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

Appellants Clarence Whitfield and Norman B. Monroe were convicted of unlawful possession of firearms following a prior felony conviction. The appellants raise various arguments concerning the lawfulness of a police search of Whitfield's car and the sufficiency of the evidence introduced against them at their joint trial. We affirm Whitfield's conviction but reverse Monroe's, the latter lacking adequate evidence.

## I. THE FACTS

Around February 19, 1979, Detective Johnnie Ray Mathis of the Metropolitan Police Department in Washington, D. C., received information from a previously reliable informant[1] that a man known to the informant as "Lockjaw," later identified as Appellant Monroe, had been selling heroin near a convenience store located in the 1300 block of S Street, N.W., in Washington. The informant stated that Lockjaw's practice was to have another man drive him to the store in a yellow Chevrolet Impala with a white top. The informant also said that he personally had observed drugs and guns in the car.

In response to this tip, Mathis went to the 1300 block of S Street and there, from the information he had received, identified Lockjaw. For about a week, Mathis observed Lockjaw receiving money from people in the vicinity of the convenience store. Around 3:00 p. m. on the afternoon of February 27, Mathis and another detective arrived in the area and saw Lockjaw with several persons gathered around him. Mathis recognized some of these individuals as persons he already believed to be drug runners, i. e., street sellers. The detectives saw Lockjaw give something to one of these persons. Shortly thereafter, they observed this runner take money from approximately ten other persons and give them small white objects in return. On one occasion, the recipient held up a small plastic bag that appeared to contain a white powder.

During this same period, the detectives also saw a man later identified as Appellant Whitfield receive money from another runner. The detective accompanying Mathis also saw Lockjaw carry a bundle of clothes into the convenience store in a manner that suggested he was concealing a gun.

After about twenty to thirty minutes, Whitfield left the scene. Approximately five minutes later, he returned driving a white and yellow Chevrolet Impala. He left the car and spoke with Lockjaw. He then returned to the car and pulled it in front of the convenience store, where Lockjaw and two other men got in. Mathis recognized one of the other men as a person he previously had arrested on drug and firearms charges. After a few moments, Lockjaw got out of the car, looked around, and ran into the store. He returned with a green plastic bag. Whitfield then drove the car away with Lockjaw in the right front seat and the other two men in the back.

Mathis radioed a description of the automobile to his superior, Sergeant Lawrence C. Ware, who, along with three other officers, was in a police cruiser nearby. Mathis had been keeping Ware abreast of his investigation of Lockjaw, including the informant's tip and his own subsequent observations. Mathis told Ware that the car had four people inside, one of whom he previously had arrested for drug and firearms violations. Mathis suggested that Ware "spot check" the car and its occupants. He also noted that the other detective with him felt there might be guns in the car. Accordingly, Mathis advised Ware to proceed with caution.

Ware soon spotted the Impala in the 1000 block of 12th Street, N.W. He attempted to activate the cruiser's flashers and siren to pull the car over, but a mechanical problem prevented them from functioning properly. Ware followed the car until it stopped of its own accord in the 300 block of O Street, N.W.

Ware and his fellow officers approached the car. Ware asked the driver for his

---

1. Mathis testified that the informant had given him information on nine prior occasions and that this information had proved accurate.

license and registration. He produced his license, which identified him as Clarence Whitfield, but could not produce the car's registration. In the meantime, the other officers questioned the other passengers, including Lockjaw, who identified himself as Norman B. Monroe. Ware returned to the cruiser and relayed identifying information on the car and its occupants to police headquarters for a computer check. During this time Monroe entered a building and then returned to the car.

While in the cruiser, Ware noticed for the first time that the automobile's license tags, which were only temporary ones, had expired. He returned to the car and told Whitfield that he was impounding the car for expired tags and asked for the keys. Whitfield refused. Ware then reached into Whitfield's pocket and removed the keys himself. Ware ordered the other officers to search the front seat, the back seat, and the glove compartment.[2] Under each side of the front seat, the officers found a loaded gun, out of sight but within reach of the front-seat occupants. The officers placed both Whitfield and Monroe under arrest. Ware and one of the other officers then unlocked and opened the trunk. Inside they found a brown paper bag containing small packages of white powder, which, after analysis, proved to be heroin.

Whitfield and Monroe were indicted on charges of possessing heroin with the intent to distribute, violations of 21 U.S.C. § 841(a)

(1976), simple possession of heroin, violations of D.C.Code § 33–402(a) (1973), and possessing firearms following prior felony convictions, violations of section 1202(a) of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, § 1202(a), 82 Stat. 197, *reprinted in* 18 U.S.C. App. (1976). The trial court subsequently suppressed the heroin seized from the car, and the Government dropped the drug charges.[3] On the other hand, the court did admit the firearms into evidence. At a joint trial, the Government introduced testimony placing both appellants in the car and the guns within easy reach under each side of the front seat. The evidence also showed Whitfield to have been the driver and owner of the car and Monroe the front-seat passenger. A jury convicted both appellants of illegally possessing firearms. They now appeal, claiming that the guns should have been suppressed and that the jury lacked sufficient evidence to convict them.

## II. THE SEARCH

Both appellants contest the search of Whitfield's car.[4] They contend that the police lacked probable cause and that even if they had probable cause they should have obtained a warrant.[5] We reject both arguments.

### A. *Probable Cause*

We need pause only briefly on the question of probable cause, for we believe it

---

2. In so doing, the officers went beyond the scope of traffic-impoundment inventories as outlined in their police manual. The manual limits these inventories to the removal of items in plain view and of an apparent value of $25 or more, and even this narrow perusal of the car's interior may occur only after the police have brought the car to the lot for impoundment. See Reply Brief of Whitfield, app. at 13 15. Looking under the seats where the occupants of the vehicle were just sitting, however, is not outside the scope of a reasonable search based on probable cause.

3. We intimate no view on whether the district court's decision to suppress the narcotics was correct.

4. Ordinarily, a passenger does not have an expectation of privacy in a car sufficient for him to raise a fourth amendment challenge to a

search of the car. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). *See also United States v. Salvucci*, -- U.S. ----, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) (overruling the "automatic standing" rule of *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)). We need not decide whether Monroe may raise a fourth amendment claim, for we conclude, first, that the search was lawful, and, second, that his conviction must fall because of insufficient evidence. We therefore proceed assuming without deciding that Monroe could challenge the officers' conduct.

5. Some remarks in Sergeant Ware's testimony indicate that he may have been trying to bring his search of Whitfield's car within the bounds of a lawful inventory pursuant to a traffic impoundment. *See South Dakota v. Opperman*,

clearly was present. At the time he and his fellow officers stopped and searched Whitfield's car, Ware knew at least that (1) a reliable informant had told Mathis that Lockjaw was selling narcotics from the car and that the informant personally had seen drugs and guns in the car and (2) Mathis on prior days had seen Lockjaw and the car at the location the informant had specified and had observed him taking money from people there.[6] This information is more than adequate to have raised a probability of criminal activity, which is all probable cause requires, see *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 581, 540, 21 L.Ed.2d 637 (1969); *United States v. Davis*, 617 F.2d 677 at 692 (D.C.Cir. 1979). *See generally id.* at 693.

## B. *The Need for a Warrant*

■ The appellants argue in the alternative that even if the search was supported

by probable cause, the police had that probable cause well before they searched Whitfield's car and thus had ample time to obtain a warrant. Under these circumstances, according to the appellants, a warrantless search is no longer permissible, for the usual exigency that allows police to forgo a warrant is absent. We disagree. We believe that the mobility of a motor vehicle, without more, creates an exigency permitting a warrantless search based on probable cause and that the police need not carry out this search immediately upon the crystallization of probable cause.

■ In a long line of cases, the Supreme Court has held that "[o]ne of the circumstances in which the Constitution does not require a search warrant is when the police stop an automobile on the street or highway because they have probable cause to believe it contains contraband or evidence of a crime." *Arkansas v. Sanders*, 442 U.S. 753,

428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). The Government, however, has relied primarily on a theory positing a valid warrantless search based on probable cause and, at oral argument, conceded that the appellants were correct in asserting that an inventory could not be justified. Under the circumstances of this case, we would have to dismiss any inventory arguments as pure pretext. *See, e. g., United States v. Prescott*, 599 F.2d 103, 105 (5th Cir. 1979) (inventories used as pretexts for investigatory searches in the absence of probable cause are unlawful). First, Ware's testimony suggests that he was unfamiliar with traffic-inventory procedures, and he engaged in a search beyond the scope that the police manual permits for such inventories, *see* note 2 *supra. Cf. South Dakota v. Opperman*, 428 U.S. at 375, 96 S.Ct. at 3100 (following standard procedures is "a factor tending to ensure that the intrusion would be limited in scope to the extent necessary to carry out the caretaking function"). Second, and more important, the police stopped the car solely with an investigatory purpose in mind. Only later did they discover the expired tags. We do not believe that police can doff their detective caps and don their traffic-officer caps so quickly—or so completely. Any alleged traffic inventory, though perhaps called such at the time to avoid alerting the appellants to the seriousness of the situation, "was a pretext concealing an investigatory police motive." *Id.* at 376, 96 S.Ct. at 3100. Ware's comments do not bind the Government to an inventory theory. In *Jones v. United States*, 357 U.S. 493, 78 S.Ct. 1253, 2

L.Ed.2d 1514 (1958), the Supreme Court refused to entertain a rationale, first articulated at oral argument, that a warrantless search of a house was justified because the government agents were looking for the defendant, whom they had probable cause to arrest. The Court held that the record failed to support an arrest theory. On the facts before us, we have a record that supports an investigatory search and not an inventory, and the Government has pursued its investigatory theory from the beginning, *see* Government's Memorandum in Opposition to Defendants' Motion to Suppress at 3–4; Transcript of Hearing on Motion to Suppress at 142–46 (July 26, 1976). *Cf. United States v. Brookins*, 614 F.2d 1037, 1041 (5th Cir. 1980) ("inventory search of an automobile . . . made reasonable by probable cause is not invalidated as a pretext arrest by the previous occurrence of probable cause").

6. The record does not indicate that Mathis had informed Ware of what he had observed on the day the search occurred. Mathis did direct Ware to stop the car for a "spot check." Regardless of whether Mathis's discoveries that day may be imputed to Ware, *see United States v. Hawkins*, 595 F.2d 751, 752 n.2 (D.C.Cir. 1978) (per curiam), *cert. denied*, 441 U.S. 910, 99 S.Ct. 2005, 60 L.Ed.2d 380 (1979), Ware already had sufficient information from his previous discussions with Mathis to give him probable cause to believe the car contained evidence and contraband.

760, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979). *See, e. g., Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Due to their configuration, use, and regulation, only a limited expectation of privacy attaches to motor vehicles,[7] and their mobility creates an exigency that makes obtaining a warrant impracticable. Because this exigency outweighs the limited privacy interest in vehicles, police may search them without a warrant, as long as probable cause is present. *See Arkansas v. Sanders,* 442 U.S. at 761, 99 S.Ct. at 2591–92. The appellants contend, however, that this precedent is inapposite in the present case because the officers delayed after they had probable cause before they detained and searched the car. The appellants submit that this delay negates the existence of any exigency, for even the police themselves saw no need to act quickly. Given this decision to wait, the appellants argue that the police had no reason to forgo the important constitutional safeguard of obtaining a warrant.

Despite the appellants' contentions, we believe that the requirement of exigency is satisfied by the very nature of an operable motor vehicle; no further exigent factors are necessary. As the Supreme Court has observed,

> Although the original justification advanced for treating automobiles differently from houses, insofar as warrantless searches of automobiles by federal officers was concerned, was the vagrant and mobile nature of the former, warrantless searches of vehicles by state officers have been sustained in cases in which the

possibilities of the vehicle's being removed or evidence in it destroyed were remote, if not nonexistent.

*Cady v. Dombrowski,* 413 U.S. 433, 441–42, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973) (citations omitted). "[T]he inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible." *South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976). Indeed, this court recently stated categorically: "Because of their mobility, automobiles on the public highway carry with them inherent exigent circumstances when it is believed that they contain contraband." *United States v. Harris,* 627 F.2d 474, at 476–477, (D.C.Cir. 1980). Thus, the exigency arises when the police are confronted with a motor vehicle, at least when it is in a public place and apparently in operating condition. When coupled with the reduced expectation of privacy one has in an automobile, this exigency allows a warrantless search on probable cause.[8]

■ Moreover, we do not believe this exigency disappears when the police decide in good faith to delay their search for a more opportune time or place. A four-Justice plurality of the Supreme Court rejected a similar argument in *Cardwell v. Lewis,* 417 U.S. 583, 595, 94 S.Ct. 2464, 2472, 41 L.Ed.2d 325 (1974) (plurality opinion of Blackmun, J.) ("we know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the

---

7. To say that the expectation of privacy in an automobile is limited does not mean that it is nonexistent. *See Delaware v. Prouse,* 440 U.S. 648, 658, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979) (any stop of an automobile and detention of its occupants is a "seizure" governed by the fourth amendment).

8. We do not believe this result conflicts with this court's decision in *United States v. Hawkins,* 595 F.2d 751 (D.C.Cir. 1978) (per curiam), *cert. denied,* 441 U.S. 910, 99 S.Ct. 2005, 60 L.Ed.2d 380 (1979). *Hawkins* noted an "exi-

gency" sufficient to justify a warrantless search in the need of the officer in that case to know whether the defendant, who owned the car searched, had been dealing in drugs. *Id.* at 753. In this sense, an "exigency" also is present here in these officers' need to know about Monroe's drug dealings. Any broader reading of the language in *Hawkins* and its predecessors would bring them into conflict with the Supreme Court decisions quoted in the text.

first practicable moment").[9]  The Court of Appeals for the Fifth Circuit, sitting en banc, has held expressly that a delay long enough to obtain a warrant does not mean that the police must obtain one.  *United States v. Mitchell*, 538 F.2d 1230, 1232–34 (5th Cir. 1976) (en banc), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977).  *Accord, United States v. Brookins*, 614 F.2d 1037 (5th Cir. 1980).[10]

■ We find these precedents persuasive. A rule requiring police to search immediately or to jeopardize their ability to act quickly in the future very well might hamper legitimate police practices and increase the number of invasions into spheres of individual privacy.  An officer often has good reason not to stop and search a car the moment he believes he has probable cause to do so.  He may wish to reflect further on his belief or test it by looking for additional evidence, *see, e. g., United States v. Ferrara*, 539 F.2d 799, 802 (1st Cir. 1976), or consulting with his fellow officers.  He may decide searching at another time or place would prove less dangerous to himself or others.  He also may determine that an immediate confrontation would prevent him from obtaining additional evidence against the occupants or others involved in criminal activities.  If the law were to require an officer to move immediately at the risk of being precluded from taking quick action later, he would have a strong incentive to act as soon as he thinks he might have sufficient cause to do so.  Such hasty action might invade privacy interests he otherwise would leave intact because either time to reflect or additional information would al-

ter his judgment on probable cause or his need for the items sought.  Likewise, going forward immediately might needlessly impede efficient and thorough criminal investigations and endanger innocent persons.  These multiple concerns lead us to hold that, absent unusual factors counselling otherwise in a particular case, police may search a motor vehicle based on probable cause without a warrant even though they have had time to obtain one.

In reaching this conclusion, we do not mean to discourage police from seeking warrants.  On the contrary, if the officer believes that he has probable cause and that delaying will not hamper the effectiveness of his investigation, good judgment on his part would dictate applying for a warrant. If he obtains it, he avoids all the difficult questions presented by any warrantless search.  If he fails, he still may be able to secure one later, based on additional evidence, and he has avoided the harsh penalty the exclusionary rule would have imposed had he proceeded without a warrant when he lacked probable cause.  Moreover, with telephonic warrants now permissible, at least in federal cases, *see* Fed.R.Crim.P. 41(c)(2), the delay may not be long at all. Thus, we suggest, as other courts have, a simple rule of thumb for police to follow: "When in doubt, get a warrant."  *United States v. Gooch*, 603 F.2d 122, 126 n. 3 (10th Cir. 1979) (opinion on denial of rehearing).

## III.  THE SUFFICIENCY OF THE EVIDENCE

■ Both appellants contend that the Government presented insufficient evidence

---

**9.** Justice Powell joined the four members in the plurality in their judgment but not in their opinion because he believed a state prisoner should not be able to raise fourth amendment claims in a petition for habeas corpus, a position that later prevailed in *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 158 (1976).

**10.** The appellants have relied on another plurality opinion of the Supreme Court, this one in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).  The four Justices joining in that opinion said that police could not search a car in the defendant's driveway because exigent circumstances were lacking.  The opinion noted that *Chambers v. Ma-*

*roney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), had spoken only of searches on the highway, while this vehicle was parked at the defendant's home.  Moreover, the defendant in *Coolidge* already knew he was under investigation; thus, a delay in carrying out the search posed no further danger that he might discover the police investigation and destroy evidence. *See id.* at 460, 91 S.Ct. at 2034 35.  *Coolidge*, then, is a far different case from the one before us now.  Here, the car was on a public street, on its way to some unknown destination, and the appellants had not previously been made aware that a criminal investigation might be underway.

for a reasonable juror to conclude that they were in possession of the firearms found in the car. The Government based its case on constructive possession, a theory whereby possession is inferred from knowing dominion and control over the item in question. We believe that a reasonable juror could conclude that Whitfield was in possession of one or both of the guns found in his car. With regard to Monroe, however, we hold that, even viewing the evidence in the light most favorable to the Government; no reasonable trier of fact could find that Monroe possessed the gun under his seat. *See United ed States v. Bethea*, 442 F.2d 790, 792 (D.C. Cir. 1971).

The Government's evidence showed that the automobile was registered to Whitfield and that he was driving, that the police observed the car with four persons in it for five to ten minutes, that during this time they did not see any of the occupants move in a manner that would have permitted him to place a gun under the front seat, that a loaded pistol was recovered from under where Whitfield had been sitting, about one inch out of view, and that another loaded pistol was recovered from under the place where Monroe had been sitting, about three inches out of sight and with its butt end facing toward the front and within easy reach of Monroe. We believe that on this evidence it was not unreasonable for the jury to find Whitfield guilty of possession of one or both of the guns. The jurors could conclude that Whitfield, as the owner and operator of the car, had control over its contents, particularly items within easy reach of the driver's seat. *See generally United States v. Reese*, 561 F.2d 894, 898 (D.C.Cir. 1977). Whitfield introduced no evidence to the contrary. Indeed, at least during the period in which the police observed the car, none of its other occupants engaged in any action indicating that one of them might have placed the guns under the seat.

When we turn to Monroe, however, we face a different situation. This court has held expressly that "[m]erely showing that appellant was a passenger in [a] car and in proximity to the [item found] is, without more, insufficient to support a finding of possession." *United States v. Bethea*, 442 F.2d at 793. The Government did not demonstrate that Monroe at any time had ventured under the front seat either to place the gun there or even to have observed it, inadvertently or otherwise. *See id.* (noting that it would be reasonable to infer possession of contraband on the part of someone who was seen placing something in the same spot where the contraband was found). Likewise, the Government introduced no evidence connecting these or any other guns to Monroe. The Government proved only that Monroe took a five-to ten-minute car ride with his friend Whitfield and that Whitfield's car housed guns out of sight. These facts go only to accessibility, not to dominion and control. We do not believe this meager showing is enough to support a conclusion that Monroe was in control of a gun hidden from view in Whitfield's car.[11] Monroe's conviction must fall.

## IV. CONCLUSION

For the foregoing reasons, the conviction of Whitfield is affirmed and that of Monroe is reversed.

*It is so ordered.*

GESELL, District Judge, dissenting in part:

I would reverse as to Whitfield as well as Monroe, and therefore respectfully dissent in part.

---

11. In *Eason v. United States*, 281 F.2d 818 (9th Cir. 1960), the Court of Appeals for the Ninth Circuit found the "close friendship" between the owner of a car and his passenger to be permissible support for inferring that both were in possession of narcotics found in the car. *Id.* at 821. The court in *Eason*, however, also relied upon the occupants' having been on a long trip together and upon their suspicious behavior at the time customs agents conducted the search. Here, there is no evidence tying Monroe to the gun beyond the 5- to 10-minute ride in Whitfield's car and the statement of one of the back-seat passengers that Whitfield and Monroe were "friends."

This is not a situation where a moving vehicle was stopped on a pretext in order to avoid escape. Defendants had been closely observed for eight days. Sgt. Ware did not originally intend an arrest or search, but only a spot check. There was no suggestion of imminent flight or an exigent circumstance. Most important, the car was eventually lawfully immobilized because of its expired tags.

In the District Court the police and the prosecutor explained that the car had been impounded for improper tags and that the police had consciously decided to exercise their authority under applicable impoundment regulations with a view to taking immediate custody. On appeal the Government brief concedes that Sgt. Ware relied on an inventory rationale. To allow this undisputed record to be ignored in favor of a different inaccurate justification, never advanced below, is in my view not appropriate.

The regulation (General Order 602) is quite explicit as to the timing, scope, and location of inventory searches. *See* Part I.B.4 at 12–15. Specifically, no search is permitted at the point of impoundment but only later at the police facility. Only property easily visible from outside the vehicle is to be removed in the first 24 hours. Because the police relied on General Order 602 they must comply with its requirements. *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). They did not do so. Instead, under the guise of an inventory rationale, they conducted a comprehensive search covering the entire interior and trunk of the vehicle.

Moreover, a general rule never before announced by any court to the effect that all moving vehicles create *ipso facto* an exigent circumstance regardless of the facts will discourage the use of warrants and will result in an unfortunate intrusion on privacy far beyond anything the Supreme Court has approved. Surely it goes too far to say that the police officers were acting with probable cause and in exigency when the record shows that neither of these considerations entered their minds as they came up

to the vehicle. I simply cannot accept the view that the police consciously throughout the proceeding below used a pretext to conceal their true investigatory motive even from the Court. Furthermore, the Supreme Court in *Opperman* never intended to approve pretext in the sense suggested by the majority.

Accordingly, I respectfully dissent as to Whitfield.