**UNITED STATES, Appellant,**

v.

**Willie L. MINICK, Appellee.**

**No. 81–55.**

District of Columbia Court of Appeals.

Argued July 2, 1981.

Decided Dec. 14, 1981.

Rehearing En Banc Granted and Opinion Vacated Jan. 13, 1982.

Michael W. Farrell, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., and John A. Terry and Steven D. Gordon, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellant.

W. Gary Kohlman, Public Defender Service, Washington, D. C., with whom Silas J. Wasserstrom and Charles J. Ogletree, Public Defender Service, Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and KELLY and FERREN, Associate Judges.

KELLY, Associate Judge:

In an indictment filed April 22, 1980, appellee was charged with felony murder, D.C.Code 1973, § 22–2401, and rape, D.C. Code 1973, § 22–2801. By pretrial motion, appellee sought to exclude from the government's evidence, as fruit of an unlawful warrantless entry into his home, items seized from his person and from his home as well as statements made to the police following his arrest. Judge Carlisle E. Pratt granted the motion as to all physical evidence seized and as to an oral statement made by appellee in his home at the time of his arrest, but denied the motion as to an exculpatory written statement given by appellee, an hour later, at the police station. We affirm the trial court order from which the government appeals.[1]

Detective Earl C. Bryant was the only witness to testify at the suppression hearing. The substance of his testimony is recounted here in detail to show the evidence upon which the trial court based its ruling.

At approximately 12:35 a. m., on February 27, 1980, police received a telephone call from a Mr. Phillips (a security guard), who reported that a man and woman had disappeared into the woods behind an apartment building at 2135 Suitland Terrace, S.E. Two officers were sent to the scene to investigate. They spoke with Mr. Phillips who described the man as wearing a white skull cap and a short, dark brown coat. While the officers were searching the area, Mr. Phillips noticed the same man walking[2] alongside the tennis courts, near the edge of the woods, and alerted the officers. The police officers unsuccessfully gave chase; however, they noted that the eluding subject was dressed in a brown jacket, dark pants and a white skull cap. A short while thereafter, the body of Suella King was

discovered near the tennis courts, twenty-five to forty feet from where Mr. Phillips had seen the man in the white skull cap.

Detective Bryant and his partner, Detective Brooks, arrived at the scene at 1:20 a. m. A few minutes later, Bryant was told that a brown wallet had been discovered approximately twenty-five feet away from the body of the deceased, along the course the man in the white skull cap had taken. However, the wallet was not opened for another thirty-five or forty minutes while the evidence technician, Officer Muncey, completed other tasks. Around 2:00 a. m., Officer Muncey extracted from the wallet the driver's license of a Willie L. Minick, residing at 3939 R Street, S.E., an address five blocks from the scene of the crime. This information was immediately forwarded to Detectives Brooks and Bryant who also learned within minutes that the deceased had been strangled and sexually assaulted.

The detectives remained on the scene until 4:00 a. m., overseeing the continuing search for evidence and the suspect. As their efforts proved fruitless, they returned to the homicide branch office at 300 Indiana Avenue, N. W. Detective Bryant then joined Officer Muncey who had retained the lost wallet, and together they examined its contents (for a period of 15 to 20 minutes) to ascertain its ownership. Most of the items found bore the name of Willie L. Minick, although some were identified as the property of a Patricia Meyers. Meanwhile, Detective Brooks had checked police records and discovered that a Willie Minick with the same birthdate and address as the Willie Minick whose driver's license they had recovered had a prior rape conviction and a prior arrest record for a rape committed in the rear of 2135 Suitland Terrace, the location where the body of Suella King was discovered.[3] The descriptions of Minick in

---

1. D.C.Code 1973, § 23–104(a)(1).

2. Although at the pretrial hearing Detective Bryant testified on direct examination that the man was running when Mr. Phillips saw him again, alone, on cross-examination, Detective

Bryant admitted that Phillips said the man initially was *walking* along the tennis courts.

3. The trial judge evidently misunderstood Detective Bryant's testimony to be that Willie Minick had been "*convicted* of a rape in almost

the police records and on his driver's license were consistent with the descriptions given by Mr. Phillips of the man in the white skull cap. By 4:30 a. m., Detective Brooks had relayed this information to his partner. According to the suppression hearing testimony of Detective Bryant, the two "then discussed the facts of the case, and . . . went over the physical evidence that we had observed there, and at that point, . . . decided to go to the R Street address . . . to arrest Mr. Minick." The officers considered first obtaining a warrant, but decided against it because they were afraid to lose evidence, such as "dirt, clothing . . . exchange of hairs, or anything that would show contact with the victim."[4] Detective Bryant testified that their decision to effect a warrantless arrest was based on the fear that such evidence "would go down the drain with a shower or a bath." His testimony was that the quickest he had ever gotten a warrant was between two and three hours. The detective did not state how many times he had sought to obtain a warrant during the night, nor that two to three hours was generally known to be the average time required for such a task. On cross-examination, Detective Bryant admitted that neither he nor his partner ascertained which judge was available to sign warrants on an emergency basis on the night of February 26–27, 1980.

Appellee was arrested in his home at approximately five o'clock in the morning on February 27, 1980. His sister had opened the door in response to repeated knocking, and, observing five police officers with guns drawn at their sides, stepped back. The police then saw appellee asleep in a chair just inside the door and entered the room. Appellee awoke to be handcuffed and read his *Miranda* rights. The officers then searched appellee and the premises, and recovered, among other items, a set of keys, a brown jacket and, from the kitchen, a white blood-stained smock which appellee said was his work smock. Upon questioning, the appellee also stated that the tee-shirt and black pants he then had on were the clothes he had been wearing that day. Half an hour after their arrival, the officers left appellee's home, escorting him to police headquarters where appellee was photographed and combings were taken from his head and pubic area, and twigs and dirt were removed from his hair and knees. At 5:55 a. m., Detective Bryant, after advising appellee anew of his *Miranda* rights, began questioning him and obtained appellee's written, signed, exculpatory statement.

At the conclusion of the suppression hearing, Judge Pratt ruled that the warrantless police entry of appellee's home on February 27, 1980, was in violation of his Fourth Amendment rights; consequently, all physical evidence seized from his person and home would be excluded from trial.[5]

In *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Supreme Court ruled that the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry for purposes of a routine felony arrest. The government's sole argument here is that the warrantless entry of appellee's home was not to effect a routine felony arrest but was justified by exigent circumstances, as those circumstances are to be assessed under the seven factor test enunciated in *Dorman v. United States*, 140 U.S.

---

the same identical place." Bryant's description of Minick's police record was somewhat ambiguous: "[he] had previous arrests and one conviction for rape, and one offense occurred in that same area." Appellee points out in his brief that he was found not guilty of the earlier Suitland Terrace rape.

4. Observations of knee impressions and debris near the deceased's body at the scene of the crime, as well as the fact that her legs were spread wide, indicated to the officers that dirt, hair or fibers would likely be found on her assailant.

5. In addition, the court held that appellee's oral statements made in his home following arrest must also be excluded from the government's evidence because not preceded by a valid waiver of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The government has expressly refrained from challenging this portion of the court's ruling on appeal.

App.D.C. 313, 435 F.2d 385 (1970) (en banc).[6] However, our review of the trial court's ruling is limited, since we are bound to accept its findings with regard to exigent circumstances, absent clear error. *Brooks v. United States*, D.C.App., 367 A.2d 1297, 1302 (1976).

Briefly, the factual setting of *Dorman* was an armed robbery of a men's store; discovery of a monthly probation report (Dorman's) which had been dropped in the store; identification (from a photograph) of the eyewitnesses. The court explained:

> The remand findings set forth the circumstances which in the opinion of the District Judge justified Dorman's arrest without a warrant as follows: The police had positive identification of three eyewitnesses, and positive evidence of Dorman's current address. They had reason to believe Dorman might flee when he became aware of the loss of his probation papers identifying him. They knew Dorman and his associates were dangerous—they were armed and had physically abused their victims. The most likely place to find him after 10 p. m. was his home. The District Judge credited their testimony that the only purpose of the visit to his home was to arrest him. They needed no additional physical evidence. [*Dorman v. United States, supra* at 316, 435 F.2d at 388.]

In addition, it is important to note that the police called an Assistant United States Attorney, an established procedure to get preliminary approval before referring the matter to a magistrate, and began typing an affidavit to accompany an application for an arrest warrant. *Id.* at 315–16, 435 F.2d at 387–88. They were then advised that no magistrate could be found but that they could nevertheless arrest Dorman because "a felony was involved." *Id.*

The trial court did undertake to measure and balance the *Dorman* factors and unequivocally found that one of the factors supported the reasonableness of the warrantless entry, by noting that "undoubtedly, there was a grave offense involved." Another factor which could support the permissibility of the entry is the officers' reasonable belief that the suspect was on the premises. The court's finding with respect to this factor, the fourth factor in the *Dorman* list, is not entirely clear.[7] We note, however, that while it is true that at the time the officers decided to make the warrantless arrest, they had no special grounds to believe appellee would be at home, they plainly saw him there before entering his residence when his sister opened the door.

The peaceable though nonconsensual entry by the police is another factor, not specifically addressed by the trial court, but not subject to dispute, which supports the reasonableness of the entry under the *Dorman* test. Nor did the trial court make a definite finding with respect to which way the "time of entry" factor[8] would cut in

---

6. The factors listed in *Dorman v. United States, supra* at 320–21, 435 F.2d at 392–93, as showing exigent circumstances supporting a warrantless entry are:
 (1) grave offense involved;
 (2) suspect reasonably believed to be armed;
 (3) clear probable cause to arrest;
 (4) strong reason to believe that the suspect is on the premises;
 (5) likelihood that the suspect will escape if not swiftly apprehended;
 (6) whether entry is effected peaceably, without breaking;
 (7) whether entry made during day or night.

7. The following statement appears in the transcript record of the court's ruling: "They had strong reason to believe the suspect was on the premises." But it is ambiguous whether this was the trial judge's conclusion, or merely his announcement of the next factor to be considered, for the sentence after the next notes the absence of evidence on the length of time that the suspect had resided at the particular address and on "any of the attendant facts." In the intervening sentence, the trial judge refers to the fifth *Dorman* factor, the likelihood that the suspect will escape, a factor for which he finds insufficient factual support. It is thus unclear whether the last quoted sentence refers to inadequacy of factual support for the fourth or the fifth *Dorman* factors.

8. Judge Leventhal recognized that whether the entry is made during the day or the night is a factor that "works in more than one direction." *Dorman v. United States, supra* at 321, 435 F.2d at 393. Nighttime entry generally involves a greater intrusion on Fourth Amendment rights, but the delay in obtaining a night-

this case.[9] We similarly decline to resolve whether the added delay in obtaining a nighttime warrant provides the additional modicum of urgency required to justify this warrantless entry, for there is insufficient evidence of record for us to approximate either the average time required to obtain a nighttime warrant in this jurisdiction, or the time it would have required in this particular case.

 The trial judge found that the rest of the *Dorman* exigent circumstance factors did not support the reasonableness of the warrantless entry. He concluded (1) that it was doubtful that the police "had reasonably trustworthy information to believe that the suspect committed the crime, over and beyond the minimum requirements of probable cause," (2) that they "had no reason to believe that the suspect was armed," and (3) that there were no facts to support any suspicion the officers may have had that the suspect might escape if not swiftly apprehended. None of these findings is clearly erroneous based on the suppression hearing testimony of Detective Bryant.

The government vigorously contests the first of these findings and argues that it was clear error for the court to consider "doubtful" whether the police had strong probable cause to arrest appellee. However, we cannot firmly refute the trial court's conclusion that the police lacked "reasonably trustworthy information to believe that the suspect committed the crime, over and beyond the minimum requirements of probable cause." The court noted that the wallet was not found in a truly incriminating place. In light of the proximity of the residence indicated on the enclosed driver's license, it could as easily be inferred that the owner had dropped the wallet on an innocent expedition. The wallet was found twenty-five feet away from the body of the deceased, along the tennis court fence, far enough from the victim and close enough to the tennis courts to suggest

that it need not have been dropped by the fleeing suspect. Without questioning police investigative procedures, we note that the wallet was not opened for thirty-five to forty minutes after its discovery, a fact which indicates the relative lack of interest it engendered among the detectives on the scene.

Another factor which casts doubt on the association between the wallet and the man chased by the police, is that the suspect fled in a direction opposite to that of the residence indicated on the driver's license. The fact that there was a prior rape record on the man whose identifications were found in the wallet does not of itself constitute reasonably trustworthy information to believe that he committed this particular crime. Notwithstanding the court's view that it was proper for "the police to focus in on a suspect who has an identical [modus operandi]," it apparently did not find such past criminal record, even together with the location of the wallet, to constitute a clear showing of probable cause, beyond that required to obtain a warrant. We see no clear error with that conclusion.

The trial judge also considered whether the possible destruction of evidence created a sufficient urgency to justify a warrantless entry. In *Brooks v. United States, supra* at 1303, this court, while "mindful of the danger [of] a preservation of the evidence rationale," recognized that "[u]nder limited circumstances, the 'likelihood of escape' inquiry properly includes consideration of the probability that evidence as well as the suspect may be lost." (Citations omitted.) *See also Thomas v. United States,* D.C.App., 352 A.2d 390 (1976) (possibility that evidence may be lost or destroyed constitutes exigent circumstance justifying warrantless search). In this case, where the only "official" explanation for why the police had not sought a warrant was that they felt they "would lose a quantity of evidence," Judge

time warrant might underscore the level of urgency in effectuating a warrantless arrest.

**9.** The court's only reference to this factor came when defense counsel argued that nighttime

entry, such as in this case, results in a greater intrusion. The trial judge then noted that on the other hand "at nighttime [appellee] would be more likely to be home."

Pratt correctly addressed that contention. However, Detective Bryant's testimony failed to persuade him the police had a genuine, particularized concern over the destruction of evidence:

Taking—using their time frame, had they immediately applied for a warrant, they had reasonable expectations that they would have it by five o'clock. They made no effort whatsoever to obtain a warrant, but, instead, at five o'clock, they decided that the circumstances required their going without a warrant. There was no reason to believe that if the Defendant, or the suspect was going to bathe, that he had not bathed by five o'clock in the morning. It's no more persuasive than if they had decided they were going in January rather than April because there was a greater possibility that the sooner you go, the better; but, beyond some rather generalized reasoning, there was no reason to believe that.

So, the Court does not have to address itself as to whether or not the police would have a right to make a warrantless entry for the purpose of seizing evidence, when there was no realistic exigent circumstance for preserving or believing it had been preserved by the time they went in. The right of entry of a private dwelling is a sacred trust that should not be invaded except upon exceptions to the warrant requirement.

The government charges that by suggesting that the police should have applied for a warrant at 2:00 a. m., the trial court "in effect ruled that the further investigations in which the police engaged here undercut their claim of exigency at the time when they did proceed to arrest appellee" and that this puts police in the quandary of having to risk failure of the *Dorman* test either for lack of clear probable cause or for dissipation of the exigency. But the trial court cannot be faulted for the inverse relationship of these two factors. For it is true, as time passes, probable cause to arrest tends to increase, while exigency, after a certain time, tends to diminish. The passage of time reduces the exigency after the point when an immediate escape and/or destruction of evidence might be effected. The preservation of "mere evidence" and the seizure of a suspect not known to be armed, are urgencies that attenuate over time, either because the evidence or suspect has likely disappeared already, or because their existence and location have probably attained a status quo position.[10]

Both flight and destruction of evidence could have been readily accomplished in this case before the police even discovered the contents of the wallet. The police must have been aware of such possibilities since they had given chase to a man whom they believed was both the owner of the wallet and the assailant. The suspect was thus on alert that the police were on his tracks and most likely realized that the body had been discovered, possibly also that his wallet had been found. If he was intent on fleeing or destroying evidence, he had all the reason in the world to do so immediately, if ever. The likelihood that he would decide on one or the other course diminished with every passing hour, and thereby reduced the exigency that would be present in a situation of hot pursuit, or if the suspect was known to be armed.

The trial judge concluded that "there were no realistic exigent circumstances for preserving or believing [the evidence] had been preserved by the time [the police] went in." In so holding, he did not improperly substitute his "own view of what was probable and prudent" for the judgments of the experienced police officers on the scene, as alleged by the government. In evaluating the validity of the warrantless entry, the court did no more than objectively review the facts known to the officers "including the time factors" to determine whether "a prudent and cautious police officer could reasonably have concluded that

10. Reasonable belief that the suspect is armed or that there is contraband evidence to be seized may toll the attenuation of exigent circumstances since the presence of weapons or contraband presents dangers beyond the risk of flight and destruction of evidence inherent in every case where the police are not able to swiftly apprehend the wrongdoer(s).

immediate entry ... was imperative." *Chappell v. United States*, 119 U.S.App.D.C. 356, 359, 342 F.2d 935, 938 (1965). Its findings reveal no clear error,[11] but, on the contrary, fully support the grant of appellee's motion to suppress. We agree that the government failed in this case to meet its heavy burden of showing "that there was a need that could not brook the delay incident to obtaining a warrant." *Dorman v. United States, supra* at 320, 435 F.2d at 392.

*Affirmed.*

FERREN, Associate Judge, dissenting:

I respectfully dissent, for I believe the trial court erred in suppressing physical evidence seized after a warrantless entry of appellee Minick's home. There were "exigent circumstances" obviating the need for a warrant here. *See Dorman v. United States*, 140 U.S.App.D.C. 313, 320–21, 435 F.2d 385, 392–93 (1970) (en banc).

Analytically, the court must address four questions: (1) At what time did the police decide they had sufficient cause to pursue Minick? (2) Did the police act reasonably in waiting that long to do so? (3) By the time the police were ready to move against Minick, were there exigent circumstances justifying a warrantless entry under *Dorman, supra*? (4) If so, did the police enter the premises without unreasonable delay?

I.

The crime occurred at approximately 12:35 a. m. Sometime between 1:20 and 2:00 a. m., the police found a wallet 25 feet from the victim's body with a driver's license showing Minick's name and address (five blocks away). A few hours later, at approximately 4:30 a. m., the police discovered additional, crucial evidence: Minick had a prior rape conviction and previous arrests for rape, including an incident at the very location where the deceased's body had been discovered. Furthermore, Min-

ick's description in the police file matched a witness' description of the man leaving the scene. At that point, the police were satisfied that Minick probably had committed the crime.

II.

If the police had probable cause to seek a warrant at 2:00 a. m., can they be faulted for declining to proceed that soon? *See United States v. Rosselli*, 506 F.2d 627, 630 (7th Cir. 1974) (court evaluates claim of exigent circumstances from the time the police first "had a right to obtain a warrant"). Or, did the police use reasonable judgment in seeking more conclusive evidence than a lost wallet before deciding, at 4:30 a. m., to move against their prime suspect? *See United States v. Gardner*, 553 F.2d 946, 948 (5th Cir. 1977) ("the reasonableness of a search under exigent circumstances is not foreclosed by the failure to obtain a warrant at the earliest practicable moment"), *cert. denied*, 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978); *United States v. Ferrara*, 539 F.2d 799, 802 (1st Cir. 1976) (same); *Commonwealth v. Forde*, 367 Mass. 798, 802, 329 N.E.2d 717, 720 (1975) (same); *cf. Cardwell v. Lewis*, 417 U.S. 583, 595, 94 S.Ct. 2464, 2471, 41 L.Ed.2d 325 (1974) (applying the same rule in the context of a car search: "[W]e know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first practicable moment").

The answer here may be crucial. Suppose that the court evaluates a claim of exigent circumstances from the time the police first had probable cause to obtain a warrant. If the police elect not to seek a warrant but instead to continue their investigation, their right to made a warrantless entry, after finding more evidence that

11. Any error the court may have committed with regard to the fourth *Dorman* factor, *see supra* note 7, does not alter the validity of the rest of the court's findings, including its ultimate ruling, and does not leave us "with the

definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).

"clinches" the case, may have evaporated because a court could find they had time, since the advent of probable cause, to obtain a warrant. Alternatively, assume that the police are not obliged to seek a warrant until, in their reasonable judgment, they are ready to do so based on evidence beyond that required to establish mere probable cause. A claim of exigent circumstances will be available at the time the police are ready to move, for they will not have been expected to seek a warrant on less conclusive evidence. In short, the court's decision about the point in time from which the police should be expected to seek a warrant may be critical in determining whether the police acted with sufficient dispatch to claim exigent circumstances, and thus may determine the extent that the police will investigate before pursuing possible subjects.

I believe the court should start the count for a warrant as of the time the police reasonably conclude they should move against a suspect, even though by that time they may have more than minimum probable cause for the entry. I subscribe to this view for two reasons. First, an approach requiring strict timing of the inquiry from the advent of probable cause is unrealistic; it would require the court to apply "20–20 hindsight" to a fluid situation which, as it develops, is typically a difficult judgment call. *United States v. Campbell*, 581 F.2d 22, 27 (2d Cir. 1978). Second, an approach that forces the police to seek a warrant as soon as they arguably have probable cause

may result in premature police intrusions upon individual privacy—intrusions which may not occur if the police investigate further. *See United States v. Whitfield*, 203 U.S.App.D.C. 102, 108, 629 F.2d 136, 142 (1980), *cert. denied*, 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981); *Campbell, supra* at 27. In this case, for example, a wallet lost in a tennis court area is thin evidence to support an uninvited police entry into someone's home. I recognize that the police may obtain a warrant but not execute it until they have more evidence; but given that obtaining a warrant requires an investment of time and possible diversion from the investigation, I doubt that forbearance would be the norm once a warrant was in hand.

In this case, I conclude that the police acted reasonably in waiting until 4:30 a. m. to proceed against Minick.[1] The warrant clock did not begin to run earlier. *See Gardner, supra* at 948; *Ferrara, supra* at 802; *Forde, supra* at 802, 329 N.E.2d at 720.[2]

### III.

The next—and central—question is whether, at 4:30 a. m., there were exigent circumstances justifying a warrantless entry.

A. In *Dorman, supra,* the court identified seven criteria for making this evaluation.[3] Five are easily disposed of here. Although there is no record basis for a conclu-

---

1. There is no indication that the police deliberately were stalling to avoid the necessity of obtaining a warrant. *Compare United States v. Jones*, 635 F.2d 1357, 1361–62 (8th Cir. 1980) with *United States v. Houle*, 603 F.2d 1297, 1300 (8th Cir. 1979).

2. The significance of the foregoing analysis would be diminished, if not eliminated, were it possible under our local rules to obtain warrants "based on sworn oral testimony communicated by telephone," *United States v. Robinson*, 174 U.S.App.D.C. 351, 358, 533 F.2d 578, 585 (1976) (en banc). Such expeditious availability of a warrant presumably would cut down on the need to invoke the exigent circumstances exception in many cases. Fed.R.Crim.P. 41(c)(2) (Warrant upon oral testimony) now

authorizes a warrant sought by telephone, but our Super.Ct.Crim.R. 41 does not.

3. As summarized in *United States v. Lindsay*, 165 U.S.App.D.C. 105, 110, 506 F.2d 166, 171 (1974), the *Dorman* criteria are:

(1) That a grave offense is involved, particularly a crime of violence;

(2) the suspect is reasonably believed to be armed;

(3) a clear showing of probable cause;

(4) a strong reason to believe that the suspect is in the dwelling;

(5) the likelihood of escape if not swiftly apprehended;

(6) a peaceful entry as opposed to a "breaking"; and

(7) the time of entry (night or day).

sion that the "suspect [was] reasonably believed to be armed," *id.* at 320, 435 F.2d at 392, the offense obviously was a grave one, there was strong reason to believe that Minick was at home,[4] and the peacefulness of the entry offset concern that the police entered at night.[5]

This leaves the other two criteria, which are determinative here: (1) "a clear showing of probable cause ... to believe that the suspect committed the crime," *i.e.,* a showing greater than "merely the minimum of probable cause" required for a warrant, *id.* at 320–21, 435 F.2d at 392–93; and (2) "a likelihood that the suspect will escape if not swiftly apprehended."[5] *Id.* at 321, 435 F.2d at 393. Of particular relevance is this court's expansive view of the latter, escape criterion: "Under limited circumstances, the 'likelihood of escape' inquiry properly includes consideration of the probability that evidence as well as the suspect may be lost." *Brooks v. United States,* D.C.App., 367 A.2d 1297, 1303 (1976) (footnote omitted); *see Thomas v. United States,* D.C. App., 352 A.2d 390, 391 (1976).

The police officers testified that once they had sufficient cause to pursue Minick they did not seek a warrant because, in their experience, it had taken two or three hours at that time of the morning, and they feared losing evidence such as "dirt, clothing, ... exchange of hairs, or anything that would show contact with the victim."

The trial court analyzed the police explanation as follows:

> It is a very close question on the probable cause. Undoubtedly they had probable cause for the issuance of a warrant, but whether they had reasonably trustworthy information to believe that the suspect committed the crime, over and beyond the minimum requirements of probable cause, is doubtful.

They had strong reason to believe the suspect was on the premises. They had—they may have suspected that he might escape if not swiftly apprehended, but there are no facts to support that conclusion. It was not developed at the hearing as to how long or short a period of time he lived at the address, or if the police knew that at the time, or any of the attendant facts. There is no evidence that the identification of the Defendant was found in a truly incriminating place, or that they must have assumed it was found there.

Assuming these things to be so, the police were very candid in admitting that their purpose in going at that time without getting a warrant was twofold—one, that in prior experience, at that time of morning, the earliest they have been able to get a warrant is two or three hours. I'm not sure that it was an inconvenience, or they felt that interfered with ordinary police work.

They also went because they discovered what appeared to be knee marks in the dirt between the legs of the decedent, and they wanted to get to the Defendant before he had a chance to remove the dirt by bathing or whatever. They discovered these facts sometime after 1:30 and before two o'clock in the morning.

Taking—using their time frame, had they immediately applied for a warrant, they had reasonable expectations that they would have it by five o'clock. They made no effort whatsoever to obtain a warrant, but, instead, at five o'clock, they decided that the circumstances required their going without a warrant. There was no reason to believe that if the De-

---

4. The trial court found that the police "had strong reason to believe the suspect was on the premises." Although a witness saw a man fleeing from the scene of the crime in a direction different from the direct route to Minick's home, the fact that he lived only five blocks away and the fact that the incident occurred in the early morning hours combine to give a strong reason for believing he would be at home. *See Dorman v. United States,* 140

U.S.App.D.C. 313, 321, 435 F.2d 385, 393 (1970) (en banc). *But see Fisher v. Volz,* 496 F.2d 333, 338 (3d Cir. 1974) (requiring "probable cause" to believe that the suspect is in the dwelling, defined as more than "strong reason" to believe so).

5. Nighttime enhanced the likelihood that appellee was home.

fendant, or the suspect was going to bathe, that he had not bathed by five o'clock in the morning. It's no more persuasive than if they had decided they were going in January rather than April because there was a greater possibility that the sooner you go, the better; but, beyond some rather generalized reasoning, there was no reason to believe that.

So, the Court does not have to address itself as to whether or not the police would have a right to make a warrantless entry for the purpose of seizing evidence, when there was no realistic exigent circumstance for preserving or believing it had been preserved by the time they went in. The right of entry of a private dwelling is a sacred trust that should not be invaded except upon exceptions to the warrant requirement.

B. As to probable cause, the trial court's analysis is inconclusive. The court appears to say the police "had probable cause for the issuance of a warrant" at 2:00 a. m. and should have "immediately applied for a warrant" at that time. But the court also suggests that three hours later, at the time of entry, "whether they had reasonably trustworthy information to believe that the suspect committed the crime, over and beyond the minimum requirements of probable cause, is doubtful." Both analyses cannot be correct. If there was probable cause for a warrant at 2:00 a. m. based on the discovery of the wallet and Minick's driver's license, there obviously was a showing of probable cause beyond the "minimum" at 4:30 a. m. when the police discovered the prior conviction, arrests, and identification evidence. If, on the other hand, there was only "minimum" probable cause at 5:00 a. m. to believe Minick had committed the crime, there could not have been probable cause for a warrant at 2:00 a. m., before the police had discovered the substantial, additional evidence.

As I see it, therefore, the court did not make a discernable probable cause finding. This court accordingly must make its own evaluation of whether, at the time of entry, there was a "clear showing of probable cause" (i.e., well beyond the "minimum") to believe that Minick had committed the crime. *Dorman, supra* at 320–21, 435 F.2d at 392–93; *see* note 3 *supra.*[6] I am satisfied that there was.

C. As to the final factor, possible loss of evidence, the trial court found that no exigency remained by 5:00 a. m., when the police entered Minick's apartment. The court stated, "There was no reason to believe that if the Defendant, or the suspect was going to bathe, that he had not bathed by five o'clock in the morning." Perhaps as a result of finding no exigency, the court curtailed its inquiry and thus dealt only with evanescent evidence; it did not specifically address the police concern about the suspect's clothing.

In making its finding, the court presumably applied the following test: whether at 5:00 a. m. the police officers reasonably concluded there was a substantial likelihood that critical evidence was still on the premises and would be lost, absent immediate entry. *See Brooks, supra* at 1303 & n.3.

When we focus on the evanescent evidence involved—dirt, hair, and other debris—I believe it is fair to accept the trial court's premise that this evidence can be washed off the body easily. The government, after all, did not argue that traces of such evidence will remain undisturbed for several hours, despite an effort to clean the body.[7] As to the clothing, there is no obvious impediment to its disposal.[8] Thus, the question is this: did the trial court clearly err in finding, in effect, that reasonable

---

**6.** Appellate deference to the trial court is limited in this context to findings of fact. *See Brooks v. United States,* D.C.App., 367 A.2d 1297, 1302 (1976).

**7.** An argument that traces of tell-tale evidence are likely to remain after a scrubbing could prove too much. Whatever traces cannot easily be washed off are likely to remain until a warrant is available.

**8.** It is likely to be more difficult to dispose of clothing than the other evidence, however, for it may require a trip out of the apartment if not out of the building.

police officers, at 5:00 a. m., would have to conclude that if Minick were .ever going to do so, he assuredly had washed all the loose evidence off his body and disposed of his tell-tale clothing within 4½ hours of the crime?

I agree with my colleagues in the majority that "our review of the trial court's ruling is limited, since we are bound to accept its findings with regard to exigent circumstances absent clear error," *ante* at 207–208, citing *Brooks, supra* at 1302. But the trial court made no finding (except an implicit one) about Minick's clothing, which was as important to the police as the dirt, hair, and other debris on the suspect's flesh. Moreover, in finding "[t]here was no reason to believe" that the suspect "had not bathed by 5 o'clock in the morning" (if he were going to bathe at all), the court necessarily was speculating about what any—and every—criminal was likely to do once he knew the police were after a suspect.[9] The court was not basing this finding, or its implied finding that the clothing had been disposed of, on evidence related to Minick himself, such as evidence tending to prove he knew the police were after him, *see* note 9 *supra,* testimony about his behavior pattern, or questions of witness credibility. No facts, in other words, were in dispute. Under these circumstances, therefore, the court's "finding" as to the loss of evidence was actually in the nature of a legal conclusion: there could not have been exigent circumstances at the time of entry because every

criminal, knowing the police are searching for an assailant, will wash all incriminating dirt, hair, and debris off his body, and dispose of all clothing used during the assault, within 4½ hours of the crime (if he ever is going to do so). *See Robinson, supra* at 353, 533 F.2d at 580.

While I have great respect for the trial court's analysis, I cannot endorse it. To call it a finding of fact will mischaracterize what the trial court was doing. Basically, the court made a universal pronouncement about human behavior—in our parlance, a conclusion of law—which the appellate court has a responsibility to review, not only for its application to the case at hand but also for the norm it establishes for the future. I believe the trial court's approach is too inflexible for this jurisdiction to adopt.[10]

"The exigent circumstances doctrine is to be applied to the facts as perceived by the police at the time of entry . . . ." *Brooks, supra* at 1302. I do not believe reasonable police officers had to assume *either* that their suspect would have acted so rationally and thoroughly that he eliminated all incriminating evanescent evidence and clothing within 4½ hours of the crime *or* that he never would do so. *See Dorman, supra* at 321, 435·F.2d at 393.[11] To the contrary, I conclude that the police officers acted reasonably in believing that critical evidence was still likely to be on the premises within 4½ hours of the crime, but that every passing moment jeopardized that possibility.[12]

9. The record reflects that soon after the crime the police unsuccessfully chased a suspect identified as the man who took a woman into the woods. Although Minick, therefore, may have been running from the police, there is no evidence that he knew his wallet was missing or that he would have reason to believe the police, who never caught up with him, had a clue to his identity.

10. I acknowledge that if I am wrong—if the trial court is only fact-finding—I could not hold the court clearly erroneous as to the evanescent evidence, for there is no way to disprove the court's analysis. In contrast, I would be comfortable in holding clearly erroneous the court's implied finding that Minick must have disposed of his clothing within 4½ hours of the crime, for "on the entire evidence" I have "the

definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). *See* note 8 *supra.*

11. In *Dorman, supra,* the court said that after four hours "[t]he police were still dealing with a relatively recent crime, and prompt arrest might locate and recover the instrumentalities and fruits of the crime before otherwise disposed of." *Id.* at 321, 435 F.2d at 393.

12. The fact that it is speculative whether a criminal suspect would destroy all evanescent and other incriminating evidence during the first 4½ hours after the crime does not diminish the urgency of pursuing such evidence as quickly as possible. I agree with the trial

Accordingly, I conclude that, given our standard of review and considering all the *Dorman* factors, a warrantless entry was justified at 4:30 a. m.

## IV.

There is the question, finally, whether the police—confronted by exigent circumstances at 4:30 a. m.—entered the premises without unreasonable delay.[13] Even when the *Dorman* criteria are met, the court shall not excuse the unexplained failure of the police to procure a warrant if they unreasonably delayed their investigation or entry. *See United States v. Chuke*, 554 F.2d 260, 263 (6th Cir. 1977). "The essence of exigent circumstances is the lack of time to obtain a warrant without thwarting the arrest or making it more dangerous. Where time was adequate, failure to obtain a warrant should not be excused." Latzer, *Enforcement Workshop: Police Entries to Arrest—Payton v. New York*, 17 Crim.L.Bull. 156, 165 (1981).

There is no indication that the police deliberately stalled or unreasonably delayed their investigation to avoid the necessity of obtaining a warrant. *See* note 1 *supra*. From the time they learned of the crime until the time they decided (at 4:30 a. m.) to make the arrest, the police continually were engaged in accumulating evidence.

Nor did the police unreasonably delay their entry. They entered the apartment and arrested Minick at 4:50 a. m.,[14] only 20 minutes after concluding they had sufficient cause to do so. There is simply no room for an argument that the police

moved too slowly to justify a warrantless entry; no one has suggested that the police could have obtained a warrant in 20 minutes.[15] *Compare Niro v. United States*, 388 F.2d 535, 536, 539–40 (1st Cir. 1968) (warrantless entry unlawful where officers delayed more than 12 hours between time they stopped accumulating evidence and seizure); *Forde, supra* at 801–02, 329 N.E.2d at 719–720 (same; three-hour delay); *State v. Dunlap*, 395 A.2d 821, 823–25 (Me.1979) (same; 15½ hour delay); *State v. Beede*, 119 N.H. 620, 629, 406 A.2d 125, 131 (1979) (same; one-day delay), *cert. denied*, 445 U.S. 967, 100 S.Ct. 1659, 64 L.Ed.2d 244 (1980).

## V.

In summary, the police conducted their investigation without delay and reasonably concluded they had clear probable cause to pursue Minick at 4:30 a. m. They confronted exigent circumstances justifying a warrantless entry of his home at that time. They did not unreasonably delay; they entered with dispatch at 4:50 a.m., 20 minutes after determining they had sufficient cause to do so. They could not reasonably have been expected to obtain a warrant during this very short interval. At every critical decisional juncture, therefore, the police acted properly.

In affirming suppression of evidence on the ground of no exigent circumstances, my colleagues in effect hold the police accountable for failing to proceed against Minick

court, however, that there will come a point where one would have to say that the police waited too long after the crime, in contrast with waiting too long after a finding of probable cause, to claim exigent circumstances in lieu of obtaining a warrant. In the present case, we have not reached that point.

**13.** Akin to this inquiry is the question whether the police could have prevented the exigency. *See United States v. Rosselli*, 506 F.2d 627, 630 (7th Cir. 1974). Here, the police could not have done so, for even if they had placed a guard at Minick's door, they could not have prevented destruction of evidence. *See Brooks, supra* at 1303.

**14.** The majority, reflecting the trial court, refers to entry "at approximately five o'clock in the morning." *Ante* at 207. However, according to the only evidence of record, Officer Bryant's testimony, the police arrived at approximately 4:50 a. m.

**15.** Given that it was reasonable for the police not to move against Minick until 4:30 a. m. and that they did so thereafter within 20 minutes, I need not consider the reasonableness of the officers' undocumented assertion that it would take two or three hours to get a warrant.

earlier. Ironically, therefore, this decision encourages the police to seek warrants—or perhaps even to make warrantless entries—when probable cause is marginal, in derogation of the rights of privacy and freedom from unreasonable seizures. *See Whitfield, supra* at 108, 629 F.2d at 142; *Campbell, supra* at 27.

The trial court's ruling should be reversed.

Before: NEWMAN, Chief Judge; KELLY, KERN, NEBEKER, HARRIS,* MACK, FERREN, PRYOR, and BELSON, Associate Judges.

### ORDER

On consideration of appellant's petition for rehearing en banc, and it appearing that the majority of the judges of this Court has voted to grant the aforesaid petition, it is

* Associate Judge Harris did not participate in this matter.

ORDERED that appellant's petition for rehearing en banc be granted and that the December 14, 1981, opinions and judgment of this Court are hereby vacated. The Clerk of the Superior Court is directed to return to this Court the certified copy of the opinions and judgment heretofore transmitted in lieu of mandate on January 5, 1982. It is

FURTHER ORDERED that the Clerk shall schedule this matter for argument before the Court sitting en banc as soon as the business of the Court permits. Counsel are hereby directed to provide ten copies of the briefs heretofore filed to the Clerk on or before Monday, February 22, 1982.

PER CURIAM.