UNITED STATES, Appellant,

v.

Willie L. MINICK, Appellee.

No. 81-55.

District of Columbia Court of Appeals.

Argued En Banc Sept. 28, 1982.

Decided Jan. 5, 1983.

Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., and Steven D. Gordon, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellant.

Charles J. Ogletree, Public Defender Service, Washington, D.C., with whom W. Gary Kohlman, Public Defender Service, Washington, D.C., was on brief, for appellee.

Before NEWMAN, Chief Judge, and KELLY, KERN, NEBEKER, MACK, FERREN, PRYOR, and BELSON, Associate Judges.

FERREN, Associate Judge:

Suella King died of strangulation in the early morning of February 27, 1980. Her body was found, sexually assaulted and half naked, near tennis courts behind an apartment building at 2135 Suitland Terrace, S.E. An indictment charged appellee, Willie L. Minick, with felony murder, D.C.Code 1973, § 22–2401, and rape, id., § 22–2801.

Appellee sought to suppress certain physical evidence, taken from his home and his person, as fruits of an unlawful, warrantless entry and arrest. Appellee also moved to suppress an oral statement, made at his home at the time of arrest, as well as an exculpatory written statement, given an hour later at the police station. The trial court ordered suppression of the physical evidence and the oral statement, but denied the motion as to the written statement. The government appealed. D.C.Code 1973, § 23–104(a)(1). A divided panel of this court affirmed the trial court's ruling. The full court voted to vacate the panel's opinion and rehear the case en banc.

We conclude that there were "exigent circumstances" obviating the need for a warrant, and that the evidence, accordingly, should not have been suppressed. We reverse the trial court's order and remand the case for further proceedings.

I.

Detective Earl C. Bryant, the sole witness at the suppression hearing, testified substantially as follows:

The police received a phone call from a security guard, Mr. Phillips, at approximately 12:35 a.m. on February 27, 1980. Phillips reported seeing a man dragging a woman into the woods behind an apartment building at 2135 Suitland Terrace, S.E. He described the man as wearing a white skull cap and a short, brown coat. Two police officers arrived at the scene, spoke with Phillips, and began searching the grounds. Phillips yelled to one of the officers that a man was leaving the area by the tennis courts. The police unsuccessfully chased the man, who was wearing a white skull cap and a brown jacket. Shortly thereafter, Ms. King's body was discovered.

Detective Bryant, who was working at the homicide branch, received a phone call at 1:00 a.m. reporting the apparent homicide. He and his partner, Detective Brooks, arrived at the scene by 1:20 a.m. There, Detective Bryant observed that the woman's clothing had been removed from the lower half of her body. In the dirt between her legs he saw knee impressions and, further back, shoe marks. The medical examiner at the scene concluded that the woman had been strangled and sexually assaulted.

Sometime between 1:20 and 2:00 a.m., the police found a wallet alongside one of the tennis courts. The wallet lay along the path where the man in the white skull cap and brown jacket had fled from the police, about twenty-five feet from the victim. The evidence technician opened the wallet at approximately 2:00 a.m.; inside, the driver's license showed Willie Minick's name and address, which was five blocks away.

The detectives continued their investigation at the scene until 4:00 a.m., when they returned to the homicide office to check for records of Willie Minick. At 4:30 a.m., Detective Brooks learned that Minick had previous arrests and one conviction for rape. One of the rapes for which he had been

arrested, but not convicted, had taken place behind 2135 Suitland Terrace. Moreover, the description in the police file matched the one Phillips had given. At that point, the police decided to arrest Minick. They discussed the possibility of obtaining a warrant but rejected the idea, fearing that while they were getting the warrant "dirt, clothing, any exchange of hairs, or anything that would show contact with the victim . . . would go down the drain with a shower or a bath." Detective Bryant testified that, in his experience, at that time of night it would take at least two or three hours to get a warrant.

The police arrived at Minick's home at 4:50 a.m. and knocked on the door. Minick's sister opened it part way. Seeing the police, she stepped back; the officers could see a man, later identified as Minick, sitting in an armchair. One of the officers handcuffed Minick and advised him of his *Miranda* rights.[1] The police seized a stained white smock from atop an ironing board visible from the armchair. They also seized a short brown coat lying next to the chair, identified by one of the officers as similar to the coat worn by the man who had run past the tennis courts shortly after the crime. They took Minick to the homicide office, where an officer photographed his clothes, beard, hair, and knees. Police also took clippings and combings from Minick's head and pubic area. Twigs and debris were lodged in his ear and hair, and dirt covered his knees.

## II.

The Fourth Amendment bars police from making a warrantless, nonconsensual entry for purposes of a routine felony arrest. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Citing *Dorman v. United States,* 140 U.S.App. D.C. 313, 435 F.2d 385 (1970) (en banc), the government proffers an exception, arguing that "exigent circumstances" justified the warrantless entry here. The United States Court of Appeals for the District of Colum-

bia Circuit, in *United States v. Lindsay,* 165 U.S.App.D.C. 105, 110, 506 F.2d 166, 171 (1974), summarized the *Dorman* criteria for the trial court to consider in determining whether there are exigent circumstances:

(1) That a grave offense is involved, particularly a crime of violence;

(2) the suspect is reasonably believed to be armed;

(3) a clear showing of probable cause;

(4) a strong reason to believe that the suspect is in the dwelling;

(5) the likelihood of escape if not swiftly apprehended;

(6) a peaceful entry as opposed to a "breaking"; and

(7) the time of entry (night or day).

We are bound to accept the trial court's finding, absent clear error. *Brooks v. United States,* D.C.App., 367 A.2d 1297, 1302 (1976).

Analytically, the court must address four questions: (1) At what time did the police decide they had sufficient cause to pursue Minick? (2) Did the police act reasonably in waiting that long to do so? (3) By the time the police were ready to move against Minick, were there exigent circumstances justifying a warrantless entry under *Dorman,* *supra*? (4) If so, did the police enter the premises without unreasonable delay?

## III.

The crime occurred at approximately 12:35 a.m. Sometime between 1:20 and 2:00 a.m., the police found a wallet twenty-five feet from the victim's body with a driver's license showing Minick's name and address (five blocks away). A few hours later, at approximately 4:30 a.m., the police discovered additional, crucial evidence: Minick had a prior rape conviction and previous arrests for rape, including an incident at the very location where the deceased's body had been discovered. Furthermore, Minick's description in the police file matched witness Phillips' description of the

---

1. *Miranda v. Arizona,* 384 U.S. 436,. 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

man leaving the scene. At that point, the police were satisfied that Minick probably had committed the crime.

## IV.

If the police had probable cause to seek a warrant at 2:00 a.m., can they be faulted for declining to proceed that soon? *See United States v. Rosselli,* 506 F.2d 627, 630 (7th Cir.1974) (court evaluates claim of exigent circumstances from the time the police first "had a right to obtain a warrant"). Or, did the police use reasonable judgment in seeking more conclusive evidence than a lost wallet before deciding, at 4:30 a.m., to move against their prime suspect? *See United States v. Gardner,* 553 F.2d 946, 948 (5th Cir.1977) ("the reasonableness of a search under exigent circumstances is not foreclosed by the failure to obtain a warrant at the earliest practicable moment"), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978); *United States v. McEachin,* 216 U.S.App.D.C. 320, 326, 670 F.2d 1139, 1145 (1981) (same); *United States v. Ferrara,* 539 F.2d 799, 802 (1st Cir.1976) (same); *Commonwealth v. Forde,* 367 Mass. 798, 802, 329 N.E.2d 717, 720 (1975) (same); *cf. Cardwell v. Lewis,* 417 U.S. 583, 595, 94 S.Ct. 2464, 2472, 41 L.Ed.2d 325 (1974) (applying the same rule in the context of a car search: "[W]e know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first practicable moment").

The answer here may be crucial. Suppose that the court evaluates a claim of exigent circumstances from the time the police first had probable cause to obtain a warrant. If the police elect not to seek a warrant but instead to continue their investigation, their right to make a warrantless entry, after finding more evidence that "clinches" the case, may have evaporated because a court could find they had time, since the advent of probable cause, to obtain a warrant. Alternatively, assume that the police are not obliged to seek a warrant until, in their reasonable judgment, they are ready to do so based on evidence beyond that required to establish mere probable cause. A claim of exigent circumstances will be available at the time the police are ready to move, for they will not have been expected to seek a warrant on less conclusive evidence. In short, the court's decision about the point in time from which the police should be expected to seek a warrant may be critical in determining whether the police acted with sufficient dispatch to claim exigent circumstances, and thus may determine the extent that the police will investigate before pursuing possible subjects.

■ We conclude that the court should start the count for a warrant as of the time the police reasonably conclude they should move against a suspect, even though by that time they may have more than minimum probable cause for the entry. We reach this conclusion for two reasons. First, an approach requiring strict timing of the inquiry from the advent of probable cause is unrealistic; it would require the court to apply "20–20 hindsight" to a fluid situation which, as it develops, is typically a difficult judgment call. *United States v. Campbell,* 581 F.2d 22, 27 (2d Cir.1978). Second, an approach that forces the police to seek a warrant as soon as they arguably have probable cause may result in premature police intrusions upon individual privacy—intrusions which may not occur if the police investigate further. *See United States v. Whitfield,* 203 U.S.App.D.C. 102, 108, 629 F.2d 136, 142 (1980), *cert. denied,* 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981); *Campbell, supra* at 27. In this case, for example, a wallet lost in a tennis court area is thin evidence to support an uninvited police entry into someone's home. We recognize that the police may obtain a warrant but not execute it until they have more evidence; but given that obtaining a warrant requires an investment of time and possible diversion from the investigation, it seems unlikely that forbearance would be the norm once a warrant was in hand.

In this case, we conclude that the police acted reasonably in waiting until 4:30 a.m. to proceed against Minick.[2] The warrant clock did not begin to run earlier. *See Gardner, supra* at 948; *Ferrara, supra* at 802; *Forde, supra* 367 Mass. at 802, 329 N.E.2d at 720.[3]

## V.

The next—and central—question is whether, at 4:30 a.m., there were exigent circumstances justifying a warrantless entry.

A. Five of the seven *Dorman* criteria are easily disposed of here. Although there is no record basis for a conclusion that the "suspect [was] reasonably believed to be armed," *id.* 140 U.S.App.D.C. at 320, 435 F.2d at 392, the offense obviously was a grave one, there was strong reason to believe that Minick was at home,[4] and the peacefulness of the entry offset concern that the police entered at night.[5]

This leaves the other two criteria, which are determinative here: (1) "a clear showing of probable cause ... to believe that the suspect committed the crime," *i.e.,* a showing greater than "merely the minimum of probable cause" required for a warrant, *id.* 140 U.S.App.D.C. at 320–21, 435 F.2d at 392–93; and (2) "a likelihood that the suspect will escape if not swiftly apprehended." *Id.* at 321, 435 F.2d at 393. Of particular relevance is this court's expansive view of the latter, escape criterion: "Under limited circumstances, the 'likelihood of escape' inquiry properly includes consideration of the probability that evidence as well as the suspect may be lost." *Brooks, supra* at 1303 (footnote omitted); *see Thomas v. United States,* D.C.App., 352 A.2d 390, 391 (1976).

The police officers testified that once they had sufficient cause to pursue Minick they did not seek a warrant because, in their experience, it had taken two or three hours at that time of the morning, and they feared losing evidence such as "dirt, clothing, ... exchange of hairs, or anything that would show contact with the victim."

The trial court analyzed the police explanation as follows:

It is a very close question on the probable cause. Undoubtedly they had proba-

---

**2.** There is no indication that the police deliberately were stalling to avoid the necessity of obtaining a warrant. *Compare United States v. Jones,* 635 F.2d 1357, 1361–62 (8th Cir.1980) *with United States v. Houle,* 603 F.2d 1297, 1300 (8th Cir.1979).

**3.** The significance of the foregoing analysis would be diminished, if not eliminated, were it possible under our local rules to obtain warrants "based on sworn oral testimony communicated by telephone," *United States v. Robinson,* 174 U.S.App.D.C. 351, 358, 533 F.2d 578, 585 (1976) (en banc). Such expeditious availability of a warrant presumably would cut down on the need to invoke the exigent circumstances exception in many cases. *See McEachin, supra* 216 U.S.App.D.C. at 327–29, 670 F.2d at 1146–48. FED.R.CRIM.P. 41(c)(2) (warrant upon oral testimony) now authorizes a warrant sought by telephone, but our Super.Ct.Cr.R. 41 does not.

**4.** The trial court found that a grave offense was involved. The trial court also found that the police "had strong reason to believe the suspect was on the premises." Although a witness saw a man fleeing from the scene of the crime in a direction different from the direct route to Minick's home, the fact that he lived only five blocks away and the fact that the incident occurred in the early morning hours combine to give a strong reason for believing he would be at home. *See Dorman v. United States,* 140 U.S.App.D.C. 313, 321, 435 F.2d 385, 393 (1970) (en banc). *But see Fisher v. Volz,* 496 F.2d 333, 338 (3d Cir.1974) (requiring "probable cause" to believe that the suspect is in the dwelling, defined as more than "strong reason" to believe so).

**5.** The "time of entry" factor cuts both ways. Nighttime entry generally involves a greater intrusion on Fourth Amendment rights, but the delay in obtaining a nighttime warrant might underscore the level of urgency in effectuating a warrantless arrest. *See Dorman, supra* 140 U.S.App.D.C. at 321, 435 F.2d at 393. The trial court did not make a definite finding with respect to which way the time of entry would cut in this particular case. The court's only reference to this factor came when defense counsel argued that nighttime entry, as in this case, results in a greater intrusion. The trial court then noted that, on the other hand, "at nighttime [appellee] would be more likely to be home."

ble cause for the issuance of a warrant, but whether they had reasonably trustworthy information to believe that the suspect committed the crime, over and beyond the minimum requirements of probable cause, is doubtful.

They had strong reason to believe the suspect was on the premises. They had— they may have suspected that he might escape if not swiftly apprehended, but there are no facts to support that conclusion. It was not developed at the hearing as to how long or short a period of time he lived at the address, or if the police knew that at the time, or any of the attendant facts. There is no evidence that the identification of the Defendant was found in a truly incriminating place, or that they must have assumed it was found there.

Assuming these things to be so, the police were very candid in admitting that their purpose in going at that time without getting a warrant was twofold—one, that in prior experience, at that time of morning, the earliest they have been able to get a warrant is two or three hours. I'm not sure that it was an inconvenience, or they felt that interfered with ordinary police work.

They also went because they discovered what appeared to be knee marks in the dirt between the legs of the decedent, and they wanted to get to the Defendant before he had a chance to remove the dirt by bathing or whatever. They discovered these facts some time after 1:30 and before two o'clock in the morning.

Taking—using their time frame, had they immediately applied for a warrant, they had reasonable expectations that they would have it by five o'clock. They made no effort whatsoever to obtain a warrant, but, instead, at five o'clock, they decided that the circumstances required their going without a warrant. There was no reason to believe that if the Defendant, or the suspect was going to bathe, that he had not bathed by five o'clock in the morning. It's no more persuasive than if they had decided they

were going in January rather than April be cause there was a greater possibility that the sooner you go, the better; but, beyond some rather generalized reasoning, there was no reason to believe that.

So, the Court does not have to address itself as to whether or not the police would have a right to make a warrantless entry for the purpose of seizing evidence, when there was no realistic exigent circumstances for preserving or believing it had been preserved by the time they went in. The right of entry of a private dwelling is a sacred trust that should not be invaded except upon exceptions to the warrant requirement.

B. As to probable cause, the trial court's analysis is inconclusive. The court appears to say the police "had probable cause for the issuance of a warrant" at 2:00 a.m. and should have "immediately applied for a warrant" at that time. But the court also suggests that three hours later, at the time of entry, "whether they had reasonably trustworthy information to believe that the suspect committed the crime, over and beyond the minimum requirements of probable cause, is doubtful." Both analyses cannot be correct. If there was probable cause for a warrant at 2:00 a.m. based on the discovery of the wallet and Minick's driver's license, there obviously was a showing of probable cause beyond the "minimum" at 4:30 a.m. when the police discovered the prior conviction, arrests, and identification evidence. If, on the other hand, there was only "minimum" probable cause at 5:00 a.m. to believe Minick had committed the crime, there could not have been probable cause for a warrant at 2:00 a.m., before the police had discovered the substantial, additional evidence.

As we see it, therefore, the court did not make a discernible probable cause finding. This court accordingly must make its own evaluation of whether, at the time of entry, there was a "clear showing of probable cause" (*i.e.*, well beyond the "minimum") to believe that Minick had committed the crime. *Dorman, supra* 140 U.S.App.D.C. at

320–21, 435 F.2d at 392–93.[6] We are satisfied that there was.

C. As to the final factor, possible loss of evidence, the trial court found that no exigency remained at 5:00 a.m., when the police entered Minick's apartment. The court stated, "There was no reason to believe that if the Defendant, or the suspect was going to bathe, that he had not bathed by five o'clock in the morning." Perhaps as a result of finding no exigency, the court curtailed its inquiry and thus dealt only with evanescent evidence; it did not specifically address the police concern about the suspect's clothing.

In making its finding, the court presumably applied the following test: whether at 5:00 a.m. the police officers reasonably concluded there was a substantial likelihood that critical evidence was still on the premises and would be lost, absent immediate entry. See Brooks, supra at 1303 n. 3.

When we focus on the evanescent evidence involved—dirt, hair, and other debris—it seems fair to accept the trial court's premise that this evidence can be washed off the body easily. The government, after all, did not argue that traces of such evidence will remain undisturbed for several hours, despite an effort to clean the body.[7] As to the clothing, there is no serious impediment to its disposal.[8] Thus, the question is this: did the trial court clearly err in finding, in effect, that reasonable police officers, at 5:00 a.m., would have to conclude that if Minick were ever going to do so, he assuredly had washed all the loose evidence off his body and disposed of his tell-tale clothing within 4½ hours of the crime?

As noted earlier, this court's review of the trial court's findings as to exigent circumstances is limited to reversal only for clear error. Brooks, supra at 1302. But the trial court made no finding (except an implicit one) about Minick's clothing, which was as important to the police as the dirt, hair, and other debris on the suspect's flesh. Moreover, in finding "[t]here was no reason to believe" that the suspect "had not bathed by 5 o'clock in the morning" (if he were going to bathe at all), the court necessarily was speculating about what any—and every—criminal was likely to do once he knew the police were after a suspect.[9] The court was not basing this finding, or its implied finding that the clothing had been disposed of, on evidence related to Minick himself, such as evidence tending to prove he knew the police were after him, see note 9 supra, testimony about his behavior pattern, or questions of witness credibility. No facts, in other words, were in dispute. Under these circumstances, therefore, the court's "finding" as to the loss of evidence was actually in the nature of a legal conclusion: there could not have been exigent circumstances at the time of entry because every criminal, knowing the police are searching for an assailant, will wash all incriminating dirt, hair, and debris off his body, and dispose of all clothing used during the assault, within 4½ hours of the crime (if he ever is going to do so). See Robinson, supra 174 U.S.App.D.C. at 353, 533 F.2d at 580.

We cannot endorse the trial court's analysis. To call it a finding of fact would mischaracterize what the trial court was doing. Basically, the court made a univer-

---

**6.** Appellate deference to the trial court is limited in this context to findings of fact. See Brooks v. United States, D.C.App., 367 A.2d 1297, 1302 (1976).

**7.** An argument that traces of tell-tale evidence are likely to remain after a scrubbing could prove too much. Whatever traces cannot easily be washed off are likely to remain until a warrant is available.

**8.** It is likely to be more difficult to dispose of clothing than the other evidence, however, for it may require a trip out of the apartment if not out of the building.

**9.** The record reflects that soon after the crime the police unsuccessfully chased a suspect identified as the man who took a woman into the woods. Although Minick, therefore, may have been running from the police, there is no evidence that he knew his wallet was missing or that he would have reason to believe the police, who never caught up with him, had a clue to his identity.

sal pronouncement about human behavior—in our parlance, a conclusion of law—which the appellate court has a responsibility to review, not only for its application to the case at hand but also for the norm it establishes for the future. The trial court's approach is too inflexible for this jurisdiction to adopt.

"The exigent circumstances doctrine is to be applied to the facts as perceived by the police at the time of entry...." *Brooks, supra* at 1302. We do not believe reasonable police officers had to assume *either* that their suspect would have acted so rationally and thoroughly that he eliminated all incriminating evanescent evidence and clothing within 4½ hours of the crime *or* that he never would do so. *See Dorman, supra* 140 U.S.App.D.C. at 321, 435 F.2d at 393.[10] To the contrary, we conclude that the police officers acted reasonably in believing that critical evidence was still likely to be on the premises within 4½ hours of the crime, but that every passing moment jeopardized that possibility.[11]

Accordingly, we conclude that, given our standard of review and considering all the *Dorman* factors, a warrantless entry was justified at 4:30 a.m.

### VI.

■ There is the question, finally, whether the police—confronted by exigent circumstances at 4:30 a.m.—entered the prem-ises without unreasonable delay.[12] Even when the *Dorman* criteria are met, the court shall not excuse the unexplained failure of the police to procure a warrant if they unreasonably delayed their investigation or entry. *See United States v. Chuke,* 554 F.2d 260, 263 (6th Cir.1977). "The essence of exigent circumstances is the lack of time to obtain a warrant without thwarting the arrest or making it more dangerous. Where time was adequate, failure to obtain a warrant should not be excused." Latzer, *Enforcement Workshop: Police Entries to Arrest—Payton v. New York,* 17 CRIM.L. BULL, 156, 165 (1981).

■ There is no indication that the police deliberately stalled or unreasonably delayed their investigation to avoid the necessity of obtaining a warrant. *See* note 2 *supra.* From the time they learned of the crime until the time they decided (at 4:30 a.m.) to make the arrest, the police continually were engaged in accumulating evidence.

Nor did the police unreasonably delay their entry. They entered the apartment and arrested Minick at 4:50 a.m.,[13] only 20 minutes after concluding they had sufficient cause to do so. There is simply no room for an argument that the police moved too slowly to justify a warrantless entry; no one has suggested that the police could have obtained a warrant in 20 minutes.[14] *Compare Niro v. United States,* 388

---

**10.** In *Dorman, supra,* the court said that after four hours "[t]he police were still dealing with a relatively recent crime, and prompt arrest might locate and recover the instrumentalities and fruits of the crime before otherwise disposed of." *Id.* 140 U.S.App.D.C. at 321, 435 F.2d at 393.

**11.** The fact that it is speculative whether a criminal suspect would destroy all evanescent and other incriminating evidence during the first 4½ hours after the crime does not diminish the urgency of pursuing such evidence as quickly as possible. We agree with the trial court that there will come a point where one would have to say that the police waited too long after the crime, in contrast with waiting too long after a finding of probable cause, to claim exigent circumstances in lieu of obtaining

a warrant. In the present case, we have not reached that point.

**12.** Akin to this inquiry is the question whether the police could have prevented the exigency. *See United States v. Rosselli,* 506 F.2d 627, 630 (7th Cir.1974). Here, the police could not have done so, for even if they had placed a guard at Minick's door, they could not have prevented destruction of evidence. *See Brooks, supra* at 1303.

**13.** The dissent, reflecting the trial court, refers to entry "[a]t 5:00 a.m." At 882. However, according to the only evidence of record, Officer Bryant's testimony, the police arrived at approximately 4:50 a.m.

**14.** Given that it was reasonable for the police not to move against Minick until 4:30 a.m. and

F.2d 535, 536, 539–40 (1st Cir.1968) (warrantless entry unlawful where officers delayed more than 12 hours between time they stopped accumulating evidence and seizure); *Forde, supra* 367 Mass. at 801–02, 329 N.E.2d at 719–20 (same; three-hour delay); *State v. Dunlap,* 395 A.2d 821, 823–25 (Me.1979) (same; 15½ hour delay); *State v. Beede,* 119 N.H. 620, 629, 406 A.2d 125, 131 (1979) (same; one-day delay), *cert. denied,* 445 U.S. 967, 100 S.Ct. 1659, 64 L.Ed.2d 244 (1980).

## VII.

In summary, the police conducted their investigation without delay and reasonably concluded they had clear probable cause to pursue Minick at 4:30 a.m. They confronted exigent circumstances justifying a warrantless entry of his home at that time. They did not unreasonably delay; they entered with dispatch at 4:50 a.m., 20 minutes after determining they had sufficient cause to do so. They could not reasonably have been expected to obtain a warrant during this very short interval. At every critical decisional juncture, therefore, the police acted properly.

*Reversed and remanded for further proceedings.*

KELLY, Associate Judge, with whom NEWMAN, Chief Judge and MACK, Associate Judge join, dissenting:

The events of the morning of February 27, 1980, define the limits of our disagreement in this case. I mention them briefly for clarity.[1]

The body of a homicide victim was found that morning about 12:35 a.m. Policemen who had been summoned to the area shortly before had chased and lost a suspect wearing clothes matching those described to them by the witness Phillips. Detectives Bryant and Brooks arrived about an hour later and within minutes were told that a wallet had been found not far from the body. The wallet was not opened for some appreciable time, however. When it was, the detectives learned that it contained appellee Minick's driver's license, listing a nearby address. Notwithstanding, a continuing search of the area for evidence and for the suspect was unproductive.

The detectives returned to their office about 4:00 a.m., where the wallet and its contents were reexamined at length. Arrest records were checked as well, and more information was discovered which targeted appellee as a likely suspect. The detectives then decided to arrest Minick without obtaining a warrant, an inconvenient formality which, in their considered judgment, might have allowed for destruction of crucial evidence. As the majority puts it: "They discussed the possibility of obtaining a warrant but *rejected* the idea . . . ." *Ante* at 876 (emphasis added). Presumably one is to applaud this fleeting nod to constitutional concerns.

At the motions hearing Detective Bryant said that the decision to effect a warrantless arrest was based on a fear that vital evidence "would go down the drain with a shower or a bath." He testified that the quickest he had ever gotten a warrant was between two and three hours, but he did not state how many times he had sought to obtain a warrant during the night, nor that two to three hours was generally known to be the average time required for such a task. On cross-examination, Detective Bryant admitted that neither he nor his partner made any attempt to ascertain which judge was available to sign warrants on an emergency basis that night.

At 5:00 a.m., a number of police officers entered appellee's home, at gunpoint, only to find him unchanged, unwashed and

that they did so thereafter within 20 minutes, we need not consider the reasonableness of the officers' undocumented assertion that it would take two or three hours to get a warrant.

1. There is a comprehensive statement of facts in the panel majority opinion, reported as *United States v. Minick,* D.C.App., 438 A.2d 205, 206–11 (1981), *vacated and reh'g en banc granted* (1982).

asleep. Appellee was awakened, arrested, searched, and, finally, advised of his *Miranda* rights.[2] A signed exculpatory statement given to the police later was not suppressed. Evidence seized at the home and an oral statement made there were suppressed, but the government appeals only the suppression of physical evidence.[3]

## I

We agree, I think, that *Dorman v. United States,* 140 U.S.App.D.C. 313, 435 F.2d 385 (1970) (en banc), is our legal guide since the government cites exigent circumstances to justify the warrantless entry and arrest. The motions judge, upon findings now said to be inconclusive, indiscernible and inflexible, was unpersuaded of the right of the government's position. A majority of this court is, however, and because it disputes the court's findings, holds them clearly erroneous, as it must to reverse. *Brooks v. United States,* D.C.App., 367 A.2d 1297, 1302 (1976).

The majority poses, and addresses (analytically, it says) four questions. Its analysis is concerned, in the main, with the decisions made by the officers at each stage of the investigation and the deference the court must give to each one. We now have a warrant clock which ticks away imperceptibly yet inexorably on an incipient violation of constitutional rights, but only, the majority holds "as of the time the police reasonably conclude they should move against a suspect, even though by that time they may have more than minimum probable cause for the entry." *Ante* at 877. It is this notion, which recurs throughout the opinion, that is so disturbing.

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. The court held that appellee's oral statements made in his home following arrest must be excluded from the government's evidence because not preceded by a valid *Miranda* warning. The government has expressly refrained from challenging this portion of the court's ruling on appeal.

4. These factors are:

## II

*Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), is but one decision which holds that the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a home to make a routine felony arrest. The government concedes as much, but argues that the warrantless entry here was justified by exigent circumstances, as those circumstances are to be assessed under the seven-factor test enunciated in *Dorman v. United States, supra.*[4]

The factual setting of *Dorman* was an armed robbery of a men's store, discovery of a probation report (Dorman's) which had been dropped in the store, and positive identifications (from a photograph) by eyewitnesses. The court explained:

> The remand findings set forth the circumstances which in the opinion of the District Judge justified Dorman's arrest without a warrant as follows: The police had positive identification of three eyewitnesses, and positive evidence of Dorman's current address. They had reason to believe Dorman might flee when he became aware of the loss of his probation papers identifying him. They knew Dorman and his associates were dangerous— they were armed and had physically abused their victims. The most likely place to find him after 10 p.m. was his home. The District Judge credited their testimony that the only purpose of the visit to his home was to arrest him. They needed no additional physical evidence. [*Id.* 140 U.S.App.D.C. at 316, 435 F.2d at 388.]

(1) grave offense involved;
(2) suspect reasonably believed to be armed;
(3) clear probable cause to arrest;
(4) strong reason to believe that the suspect is on the premises;
(5) likelihood that the suspect will escape if not swiftly apprehended;
(6) whether entry is effected peaceably, without breaking;
(7) whether entry is made during day or night.

In addition, it was crucial that in *Dorman,* rather than disdaining established procedures, the police called an Assistant United States Attorney for preliminary approval before referring the matter to a magistrate, and at the same time began typing an affidavit to accompany an application for an arrest warrant. *Id.* at 315–16, 435 F.2d at 387–88. They were then advised that no magistrate could be found but that they could nevertheless arrest Dorman because "a felony was involved." *Id.* at 316, 435 F.2d at 388.

The trial court undertook to measure and balance the *Dorman* factors and found that one supported the reasonableness of the warrantless entry by noting that "undoubtedly, there was a grave offense involved." Another factor which could have supported the entry is a reasonable belief that the suspect was on the premises. The court's finding with respect to this factor, the fourth in the *Dorman* list, is not entirely clear.[5] Nevertheless, while at the time the officers decided to make the warrantless arrest, they had no special grounds to believe appellee would be at home, they plainly saw him there before entering his residence when his sister opened the door.

The peaceable though nonconsensual entry by the police is another factor not specifically addressed by the trial court which arguably could support the reasonableness of the entry. The trial court also made no definite finding with respect to which way the "time of entry" factor[6] would cut in this case,[7] so this court cannot resolve whether the added delay in obtaining a nighttime warrant provides the additional modicum of urgency required to justify this warrantless entry, absent evidence of record to approximate either the average time required to obtain a nighttime warrant in this jurisdiction, or the time it would have required in this particular case.

The trial judge found that the remaining *Dorman* factors did not support the reasonableness of the warrantless entry, concluding (1) that it was doubtful that the police "had reasonably trustworthy information to believe that the suspect committed the crime, over and beyond the minimum requirements of probable cause," (2) that they "had no reason to believe that the suspect was armed,"[8] and (3) that there were no facts to support any suspicion the officer may have had that the suspect might escape if not swiftly apprehended. None of these findings is clearly erroneous based on the suppression hearing testimony of Detective Bryant.

The government vigorously contests the first of these findings and argues that it was clear error for the court to consider "doubtful" whether the police had strong probable cause to arrest appellee. However, the conclusion that the police lacked

---

5. The following statement appears in the transcript record of the court's ruling: "They had strong reason to believe the suspect was on the premises." It is ambiguous whether this was the trial judge's conclusion, or merely his announcement of the next factor to be considered, for the sentence after the next notes the absence of evidence on the length of time that the suspect had resided at the particular address and on "any of the attendant facts." In the intervening sentence, the trial judge refers to the fifth *Dorman* factor, the likelihood that the suspect will escape, a factor for which he finds insufficient factual support. It is thus unclear whether the last quoted sentence refers to inadequacy of factual support for the fourth or fifth *Dorman* factor.

6. Judge Leventhal recognized that whether the entry is made during the day or the night is a factor that "works in more than one direction."

*Dorman v. United States, supra* at 321, 435 F.2d at 393. Nighttime entry generally involves a greater intrusion on Fourth Amendment rights, but the delay in obtaining a nighttime warrant might underscore the level of urgency in effectuating a warrantless arrest.

7. The court's only reference to this factor came when defense counsel argued that nighttime entry, such as in this case, results in a greater intrusion. The trial judge then noted that on the other hand, "at nighttime [appellant] would be more likely to be home."

8. "This consideration bears materially on the justification for a warrantless entry." *Id.* at 320, 435 F.2d at 392 (footnote omitted). But the majority "easily" disposes of this factor by virtually ignoring it.

"reasonably trustworthy information to believe that the suspect committed the crime, over and beyond the minimum requirements of probable cause" is not clearly erroneous. The court noted that the wallet was not found in a truly incriminating place and in light of the proximity of the residence indicated on the enclosed driver's license, it could as easily be inferred that the owner had dropped the wallet on an innocent expedition. The wallet was found twenty-five feet away from the body of the deceased, along the tennis court fence, far enough from the victim and close enough to the court to suggest that it need not have been dropped by the fleeing suspect. Without questioning police investigative procedures, we note that the wallet was not opened for thirty-five to forty minutes after its discovery, a fact which indicates the relative lack of interest it engendered among the detectives on the scene.

Another factor which casts doubt on the association between the wallet and the man chased by the police, is that the suspect fled in a direction opposite to that of the residence indicated on the driver's license. The fact that there was a prior rape record on the man whose identifications were found in the wallet does not of itself constitute reasonably trustworthy information to believe that he committed this particular crime. Notwithstanding the court's view that it was proper for "the police to focus in on a suspect who has an identical [modus operandi]," it apparently did not find such past criminal record, even together with the location of the wallet, to constitute a clear showing of probable cause, beyond that required to obtain a warrant. I see no clear error in that conclusion.

The trial judge also considered whether the possible destruction of evidence created a sufficient urgency to justify a warrantless entry. In *Brooks v. United States, supra* at 1303, this court, while "mindful of the danger [of] a preservation of the evidence rationale," recognized that "[u]nder limited circumstances, the 'likelihood of escape' inquiry properly includes consideration of the probability that evidence as well as the suspect may be lost." (Citations omitted.) *See also Thomas v. United States,* D.C.App., 352 A.2d 390 (1976) (possibility that evidence may be lost or destroyed constitutes exigent circumstances justifying warrantless search). In this case, where the only "official" explanation for why the police had not sought a warrant was that they felt they "would lose a quantity of evidence," Judge Pratt correctly addressed that contention. However, Detective Bryant's testimony failed to persuade him that the police had a genuine, particularized concern over the destruction of evidence:

> Taking—using their time frame, had they immediately applied for a warrant, they had reasonable expectations that they would have it by five o'clock. They made no effort whatsoever to obtain a warrant, but, instead, at five o'clock, they decided that the circumstances required their going without a warrant. There was no reason to believe that if the Defendant, or the suspect was going to bathe, that he had not bathed by five o'clock in the morning. It's no more persuasive than if they had decided they were going in January rather than April because there was a greater possibility that the sooner you go, the better; but, beyond some rather generalized reasoning, there was no reason to believe that.

> So, the Court does not have to address itself as to whether or not the police would have a right to make a warrantless entry for the purpose of seizing evidence, when there was no realistic exigent circumstance for preserving or believing it had been preserved by the time they went in. The right of entry of a private dwelling is a sacred trust that should not be invaded except upon exceptions to the warrant requirement.

The government charges that by suggesting that the police should have applied for a warrant at 2:00 a.m., the trial court "in effect ruled that the further investigations in which the police engaged here undercut their claim of exigency at the time when they did proceed to arrest appellee" and

that this puts police in the quandary of having to risk failure of the *Dorman* test either for lack of clear probable cause or for dissipation of the exigency. But the court cannot be faulted for the inverse relationship of these two factors. It is true, as time passes and investigation proceeds, probable cause to arrest may tend to increase, while exigency, after a certain time, tends to diminish. The passage of time reduces the exigency after the point when an immediate escape and/or destruction of evidence might be effected. The preservation of "mere evidence" and the seizure of a suspect not known to be armed, are urgencies that attenuate over time, either because the evidence or suspect has likely disappeared already, or because their existence and location have probably attained a status quo position.[9]

Both flight and destruction of evidence could have been readily accomplished in this case before the police even discovered the contents of the wallet. The police must have been aware of such possibilities since they had given chase to a man whom they believed was both the owner of the wallet and the assailant. The suspect was thus on alert that the police were on his tracks and most likely realized that the body had been discovered and possibly also that his wallet had been found. If he was intent on fleeing or destroying evidence, he had all the reason in the world to do so immediately, if ever. The likelihood that he would decide

on one or the other course diminished with every passing hour, and thereby reduced the exigency that would be present in a situation of hot pursuit, or if the suspect was known to be armed.

The trial judge concluded that "there were no realistic exigent circumstances for preserving or believing [the evidence] had been preserved by the time [the police] went in."[10] In so holding, he did not improperly substitute his "own view of what was probable and prudent" for the judgments of the experienced police officers on the scene, as alleged by the government.[11] In evaluating the validity of the warrantless entry, the court did no more than objectively review the facts known to the officers, "including the time factors," to determine whether "a prudent and cautious police officer could reasonably have concluded that immediate entry . . . was imperative." *Chappell v. United States,* 119 U.S.App.D.C. 356, 359, 342 F.2d 935, 938 (1965). Its findings reveal no clear error;[12] on the contrary, they fully support the grant of appellee's motion to suppress. In my judgment, the government failed in this case to meet its heavy burden of showing "that there was a need that could not brook the delay incident to obtaining a warrant." *Dorman v. United States, supra,* 140 U.S.App.D.C. at 320, 435 F.2d at 392.

I agree completely that, in the words of Judge Leventhal:

9. Reasonable belief that the suspect is armed or that there is contraband evidence to be seized may toll the attenuation of exigent circumstances since the presence of weapons or other contraband presents dangers beyond the risk of flight and destruction of evidence inherent in every case where the police are not able to swiftly apprehend the wrongdoer(s).

10. After reading the majority opinion the trial judge will no doubt be impressed by the dissection of his analysis of this factor, particularly as it relates to the fatal defect of clothing disposal. He will also, I suggest, be astonished to learn that rather than finding a fact, he has made a "universal pronouncement about human behavior," known in legal circles as a conclusion of law.

11. No one except the majority even suggests that there is a question of "stalling" by the police to avoid getting a warrant. Nor does anyone propose that the officers could be expected to get a warrant in the 20 minutes time it took to get to appellee's home. Both are irrelevancies, injected in the opinion, I assume, because the majority has to answer the questions it asks itself.

12. Any error the court may have committed with regard to the fourth *Dorman* factor, *see supra* note 5, does not alter the validity of the rest of the court's findings, including its ultimate ruling, and does not leave me "with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

The courts have respect for the intelligent law enforcement activities of the police, situated as they are in the front line of the campaign for law and order, and this case plainly depicts police officers engaged steadily and systematically in the identification and pursuit of the criminal suspects.... [*Id.* at 322, 435 F.2d at 394.]

I strongly endorse his further statement that

Responsible police are aware that a responsible procedure which accords to the police the latitude for intelligent law enforcement but withholds absolute discretion is the sound approach for securing the overall combination of law and justice that is the inspiration of a democratic society. [*Id.*]

The relative considerations in *Dorman* favored the warrantless entry because the police had three positive eyewitness identifications, establishing clear probable cause; Dorman was reasonably believed to be armed; and, as it happened, a magistrate was unavailable that night.[13] Here, probable cause was minimal. Minick was not identified, he was not believed to be armed, and no attempt was made to ascertain the availability of a judge to issue a warrant.[14]

I would affirm.

---

**13.** From its discussion of procedures then in place to obtain a nighttime warrant, I am certain the Circuit Court did not anticipate this problem would recur. In *United States v. McEachin*, 216 U.S.App.D.C. 320, 670 F.2d 1139 (1981), a warrantless search for a shotgun three weeks after a robbery was held to be justified by exigent circumstances. Logic and wisdom aside, *McEachin* differs factually, in material respects, from this case and is neither persuasive nor leading authority.

**14.** I agree with my brother Ferren that the Superior Court might well consider warrants by telephone. Speaking as a participant in this process for some years, however, the emphasis on contacting a judge is misleading; it is the judge who normally waits, day or night, for the papers to be prepared for signature.